UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Michael D. Ritacco, <br><br> Plaintiff, <br><br> v. <br><br> Nancy A. Berryhill, Acting <br> Commissioner of Social Security,[1] <br><br> Defendant. | No. 16 CV 50035 <br> Magistrate Judge Iain D. Johnston |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Michael D. Ritacco's quest for disability benefits is now more than five years old. Unfortunately, the end is still not in sight despite two administrative hearings already having been held.

Sometime around 1989, plaintiff starting working as a concrete laborer excavating and paving roads. After many years in this line of work, he contracted silicosis, a non-curable and progressive lung disease caused by inhaling tiny bits of silica or other fine particles. As the medical expert testified, silicosis occurs when calcified nodules run together to form conglomerates, leading to lung scarring. Plaintiff's silicosis caused shortness of breath, fatigue, and weakness, among other symptoms. By 2009, he had stopped working construction because of these symptoms. Briefly in 2011, he tried to work as a handyman for a few months, but found this job too difficult.

In December 2011, he filed a Title II application for disability insurance benefits, alleging an onset date of May 20, 2009. The first hearing was held in 2013, and shortly thereafter, the administrative law judge ("ALJ") issued a decision finding plaintiff not disabled.

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).

1

Plaintiff appealed that decision to this Court. After his opening brief was filed setting forth various errors committed by the ALJ, the Government agreed that a remand was appropriate, and the case was remanded in October 2014 without this Court ruling on the merits. In 2015, the same ALJ held a second hearing during which a medical expert testified. However, the ALJ again found plaintiff not disabled, and plaintiff again appealed. The central question remains the same as it was since the beginning—namely, whether plaintiff's silicosis, which is everyone agrees is now severe enough to prevent him from working, was severe enough on or before September 30, 2010, which is plaintiff's date last insured (hereinafter "DLI").

## BACKGROUND

The first hearing was held on July 12, 2013, and lasted 25 minutes. Plaintiff testified that (among other things) he was "[c]onstantly fatigued and tired" and could not stand for long periods. R 44. When he went grocery shopping, he sat in the pharmacy while his wife shopped. It took him a couple of hours every morning to get out of bed because he was "really weak" from the hips down. R. 48. When the ALJ asked what his doctors were doing to treat the silicosis, plaintiff stated that "[t]here's no treatment" except for a possible double lung transplant. R. 46. Plaintiff was taking various inhalers, as well as steroids.[2] After plaintiff testified, a vocational expert testified that a person with "high fatigue" could not work any full-time job. R. 52. The ALJ did not call a medical expert to testify.

On July 18, 2013, the ALJ issued a four-and-half page decision finding plaintiff not disabled during the relevant period—*i.e.* from the onset date of May 20, 2009 through the DLI of September 30, 2010 (hereinafter the "relevant period"). At Step Two of the five-step process, the ALJ found that plaintiff's silicosis was a severe impairment. However, the ALJ found that

---

[2] At one point, the ALJ noted that plaintiff was having difficulty speaking. R. 47 ("Okay, and as I'm listening to your speech, I can hear that it's difficult for you to talk. You have to kind of take a breath, get the words out, and take another breath."). This difficulty was presumably dyspnea (shortness of breath), a symptom of silicosis.

2

silicosis did not meet a listing because there was no pulmonary function test of record (*i.e.* during the relevant period). In the residual functional capacity ("RFC") analysis, the ALJ shockingly found that plaintiff could perform "the full range of work at all exertional levels." In other words, the ALJ concluded that plaintiff's silicosis caused *no limitations* in his ability to work.

After remand from this Court, a second hearing before the same ALJ was held on July 28, 2015. The ALJ began by telling plaintiff he could give nods or whispers for answers "because of [his] condition." R. 841. Plaintiff's counsel gave an opening statement summarizing the evidence. Counsel stated that plaintiff's symptoms "included weakness, dysthymia, chronic cough and chest pain;" that he was diagnosed with silicosis in approximately 2003 based on his exposure to silicone for 20 years working in construction; that his symptoms worsened in 2006 to 2007; that, in May 2009, his condition required two emergency room visits; and that he has been to the emergency room nine times due to respiratory complications. R. 842-43. There is no dispute that this summary is supported by the medical records. Plaintiff then testified about the same basic symptoms and facts as he testified to in the first hearing.

The key witness was Dr. Ronald Semerdjian, an impartial medical expert. Dr. Semerdjian asked plaintiff a preliminary question about plaintiff's cervical discectomy and whether he had any continuing pain from that problem. Plaintiff testified that "it's a mild pain" that had "mellowed out" after his surgery. R. 872. About this answer, the ALJ observed the following: "That is refreshing to hear, something got better. [] Yeah, we don't usually hear that."[3] *Id.*

Dr. Semerdjian next addressed the silicosis, stating that it was "pretty solidly documented in the record." R. 873. He opined that plaintiff did not meet Listing 3.06 based on his pulmonary function scores. Dr. Semerdjian's reasoning on this and other issues is reflected in the following

---

[3] But in the later credibility analysis, the ALJ gave plaintiff no credit for this honest answer.

3

portion of the transcript, which the Court will quote at some length because the ALJ's later decision largely glossed over it:

> Just a quick note on what silicosis is. Usually in the lungs you see little calcified nodules but what can happen in silicosis, when it's more severe, is [these] little nodules begin to run together and they conglomerate.
>
> And you get big clumps of scarring in the lungs. And when you get to that it's considered to be progressive or massive pulmonary fibrosis. And that's what they're describing on his CAT scans.
>
> The CAT scan of the chest [on] May 5, 2010, it was actually a CAT scan angiogram looking for an embolism they didn't see. But they say what he does have is moderate to severe silicosis with moderate to severe progressive massive pulmonary fibrosis along with enlarged lymph nodes.
>
> And the massive pulmonary fibrosis means that these nodules, or areas of scarring, are now running together, and it contracts the lungs. There were subsequent CAT scans of the chest. There was another one, for example, September 10, 2012, and that is read as bilateral progressive massive fibrosis.
>
> And then again [on] June 13, 2013, in 7F, a CAT scan of the chest. It says conglomerate bilateral lung masses consistent with silicosis. Conglomerate means just the same as massive pulmonary fibrosis.
>
> It really means they're clumping together. So he has evidence of significant, severe pulmonary—of silicosis with massive pulmonary fibrosis. And he has compromise of his function though it doesn't meet a listing level.
>
> He did have some oxygen studies done that I see January 10, 2012, in 28F. They did a six minute walk which means they checked his oxygen on room air, at rest and then they had him walk. In this case, they call it a six minute walk but he walked for only four minutes.
>
> He may have become short of breath. But his oxygen saturations are actually good. They stay at 96 percent so if those are the—I didn't find any other oxygen measurements. If those are the only oxygen measurements he's had, he wouldn't need oxygen.
>
> I think he's having shortness of breath partly because he's had compromise of his lung function with the scarring. And I think with the scarring, the work of breathing [] probably has increased significantly, and that is making it difficult for him to breath.

R. 873-75.

At the end of the hearing, a vocational expert testified. In response to a hypothetical about whether plaintiff could work if he "would have to take several breaks during the day" because of frequent coughs, the vocational expert stated that he could not work any full-time job. The ALJ responded as follows: "I acknowledge the fact that I don't think that you could work now. And after looking at the record, I don't think that you could work for the previous two or three years. Obviously the issue is, in this case, could you have worked before 9/30/10." R. 885.

On October 21, 2015, the ALJ again found plaintiff not disabled. This decision is about the same length as the first one (maybe half a page longer) and includes much of the same evidence and reasoning (a few parts are almost verbatim), although there are a few additions, such as a discussion of Dr. Forsythe's treatment records and a paragraph analyzing plaintiff's credibility. Although the end-result is the same, the ALJ changed her mind at Step Two by concluding that plaintiff's silicosis was not a severe impairment during the relevant period. Consequently, the ALJ did not render an RFC assessment.

**DISCUSSION**

Plaintiff raises three main arguments: (1) the ALJ applied the wrong standard at Step Two; (2) the ALJ failed to credit Dr. Forsythe's opinion; and (3) the ALJ erred in the credibility analysis. The Court agrees that these arguments (as well as others) require a remand.

**I.     Step Two Standard.**

As the Seventh Circuit has emphasized in several recent cases, Step Two is meant to be only "a *de minimis* screening for groundless claims." *See Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) ("The Step 2 determination is 'a *de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities."); *Thomas v. Colvin*, 826

5

F.3d 953, 960 (7th Cir. 2016). In *Meuser*, for example, the Seventh Circuit remanded because the ALJ, in considering whether schizophrenia was a severe impairment, applied a too-demanding standard at Step 2 by "conflat[ing] Steps 2, 4, and 5." 838 F.3d at 910. Plaintiff's main argument is that the ALJ failed to apply this standard (one he labels the "slight abnormality standard"). Although there is no smoking gun statement proving that the ALJ adopted an overly strict standard, there are multiple arguments that indirectly prove the point.

First, like the ALJ in *Meuser*, the ALJ conflated Step Two with the later steps in the analysis. The ALJ focused much attention in the decision on the issue of whether plaintiff met Listing 3.06 based on various pulmonary function tests conducted at different points in time.[4] Logically, however, the ALJ should have only addressed this Step Three issue if the ALJ first found that plaintiff had a severe impairment at Step Two. But the ALJ combined these two steps and, in so doing, essentially imported the stricter Step Three standard back into the Step Two analysis. This is the unstated premise: if plaintiff's condition was not severe enough to meet Listing 3.06, then his impairment was not severe at Step Two. But this approach misconceives the fundamentally different purposes of these two steps. The Supreme Court summarized the distinction as follows:

> The severity regulation [*i.e.* the Step Two determination] increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are *so slight* that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account. Similarly, step three streamlines the decision process by identifying those claimants whose medical impairments are *so severe* that it is likely they would be found disabled regardless of their vocational background.

*Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (emphasis added). In short, these two steps occupy opposite ends of the disability spectrum, a distinction lost in the ALJ's conflated analysis.

---

[4] Specifically, the question was whether spirometry test results fell below certain numerical thresholds set forth in Listing 3.06. The ALJ concluded—and plaintiff now seems to agree—that he could not meet this listing.

Another way to see this same point is to note that later, well after plaintiff's DLI, when his condition had progressed to the point where even the ALJ agreed he could not work and at a time when he was being considered for a double lung transplant, some of his spirometry results still did not meet the listing standard.

Second, the ALJ's Step Two analysis is flawed in another respect. The ALJ stated that the "sole" piece of evidence that she would consider was Exhibit 16F, which was Dr. Forsythe's treatment notes about visits during the relevant period. The ALJ declared that all the post-DLI evidence was irrelevant. R. 828 (such evidence is "immaterial to the issue at hand" and "all the remaining medical records are irrelevant to the instant inquiry"). But this all-or-nothing approach runs contrary to the teachings in Social Security regulations and Seventh Circuit case law. SSR 83-20, entitled "Onset of Disability," addresses the situation, similar to this case, where there is a slowly progressive impairment and precise evidence is not available and inferences, therefore, must be drawn about the claimant's condition earlier in time. In such a case, the ALJ must make "an informed judgment" based on "the facts in the particular case" and should "call on the services of a medical advisor" to answer this question and even should (if there is uncertainty) "explore other sources of documentation," such as information from friends, family members, and former employers. *Id.* To summarize, this regulation contemplates a thorough analysis after consideration of a wide range of evidence.

Seventh Circuit case law is in accord. The Seventh Circuit has stated that post-DLI evidence may be probative of the claimant's condition within the relevant period. *See Bjornson v. Astrue*, 671 F.3d 640, 642 (7th Cir. 2012) (rejecting government's argument that ALJ could not consider evidence after the date last insured); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a

certain period is relevant to a determination of claimant's condition during that period."). In *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006), the Seventh Circuit used the language of science to convey these same points:

> A disease might have a well-understood progression, so that a physician examining a patient at time *t* might have a good idea of what the patient's condition had been at time *t—n*, where *n* was the number of years, prior to the examination, by which time the patient would have had to be completely disabled to be entitled to benefits.

*Id.* at 822. This passage describes the issue in the present case to a T.

And if the agency's own regulations and binding case law is not enough, another problem with the ALJ's rule excluding all post-DLI evidence is that the ALJ did not follow it consistently. When such evidence bolstered the ALJ's theory, she cited to it. For example, she noted in the opinion that Dr. Semerdjian testified that plaintiff's "oxygen saturation was actually good at 96% (out of 100%) *in January 2012—16 months after termination of insured status*." R. 829 (emphasis added). This statement utilizes the same type of inferential retrospective diagnosis that the ALJ elsewhere eschews. The inconsistent deployment of this methodology is thus one type of impermissible cherry-picking.

Third, even if the ALJ were right to only consider pre-DLI evidence, the ALJ did not provide a complete or consistent explanation why *that* evidence was insufficient, especially given the lenient standard. Most notably, it was undisputed that plaintiff had been diagnosed— before the DLI—with "moderate to severe" silicosis of both lungs. R. 828. This diagnosis was based on objective evidence (a CT scan) and was made by several doctors. It is not clear why this evidence alone would not meet the Step Two standard even if a strict reading of the standard were used. To take perhaps an overly literal approach, why wouldn't a diagnosis of *severe* silicosis establish that there was a *severe* impairment? Severe equals severe. It is true, as the ALJ noted in her narrative, that there were some facts suggesting that plaintiff's condition was

stable or even improved temporarily during the relevant period (for example, the ALJ pointed out that Dr. Forsythe wrote that plaintiff's asthma improved after stopping smoking), but there is no sense that either Dr. Forsythe or Dr. Semerdjian believed that these facts undermined the larger diagnosis that plaintiff had moderate to severe silicosis *before* the DLI.

**II.     Medical Opinions.**

Plaintiff argues that the ALJ "improperly assessed" Dr. Forsythe's opinion by refusing to give it conclusive weight under the treating physician rule. As for latter argument, the Court is not convinced based on the current record that Dr. Forsythe's observations should be given controlling weight, mostly because he never provided any bottom-line opinion, but the Court does agree that the ALJ's overall handling of the medical opinions was flawed in several respects. The ALJ's analysis consists of the following paragraph:

> The only medical opinions of record are those of treating specialist, Dr. Forsythe, whose opinion consists of contemporaneous treatment observations, and that of Dr. Semerdjian, the impartial medical expert, whose opinion is based on a review of the existing records. Dr. Forsythe's notes demonstrate the presence of impairments, but his actions belie severity. He saw the claimant infrequently and ordered no tests. The medications he prescribed are generic pulmonary medications. Dr. Semerdjian's opinion reflects increasing severity of silicosis and COPD, but not until after September 30, 2010.

R. 830.

As a preliminary point, the ALJ's assertion that there were "only [these two] medical opinions of record" is not strictly accurate. In fact, other doctors either offered opinions or treated plaintiff and made observations similar to Dr. Forsythe. In particular, Dr. Kellar completed several RFC questionnaires, which the ALJ cited to in the first opinion. R. 24; Exs. 11F, 12F, 13F. Likewise, Dr. Stuart Rich at the University of Chicago provided an opinion in

9

2014 recommending that plaintiff seek a double lung transplant.[5] Granted, these opinions were after the DLI, and perhaps the ALJ excluded them on that ground. If this were the reason, then the same concerns set forth above are relevant. At the second hearing, Dr. Semerdjian considered post-DLI evidence in his analysis and, on his own initiative, brought up Dr. Rich's opinion, describing this consultation at the University of Chicago as one "worth mentioning." R. 875.

Turning to the two opinions the ALJ chose to consider, the Court notes that Dr. Forsythe treated plaintiff during the relevant period, but he never completed an RFC assessment nor otherwise offered any formal opinion. The ALJ acknowledged that Dr. Forsythe's notes "demonstrate the presence of impairments," a point mildly supportive of plaintiff, but the ALJ then concluded that any statements by Dr. Forsythe that supported plaintiff's claim of being found disabled should be disregarded on the theory that (according to the ALJ) Dr. Forsythe's "actions belie severity." The ALJ cited to three actions: (i) Dr. Forsythe saw plaintiff infrequently, (ii) he ordered no tests, and (iii) he prescribed only "generic" medications. Plaintiff argues convincingly that these reasons are either erroneous or based on misguided lay assumptions about the nature and treatment of silicosis. As for the frequency of visits, plaintiff first points out that Dr. Forsythe saw plaintiff twice in four months during the relevant period (in addition to seeing him additional times before this period). Plaintiff then argues that the ALJ made an unwarranted assumption what should be the "appropriate frequency" of doctor visits for someone with progressive silicosis. Dkt. #14 at 12. As for the failure to order tests, plaintiff asserts that "Dr. Forsythe did indeed order tests, including chest x-rays on both office visits during the relevant period." *Id.* Finally, as for generic medication, plaintiff argues that he was receiving treatment consistent with his condition. The larger point—one not contested by the

---

[5] Specifically, Dr. Rich stated that "it is *clear* that Michael has *severe silicosis* and likely should be considered for lung transplantation." R. 1063 (emphasis added).

Government—is that there is no cure or specific treatment for silicosis. Plaintiff was receiving the standard treatments consisting of inhalers, steroids, cough medicine, and nebulizer treatments. *Id.* at 13-14. The ALJ apparently believed that more dramatic measures were available but not utilized by plaintiff. However, no medical expert drew such a conclusion (other than the 2014 recommendations that plaintiff seek a double lung transplant). As a result, the ALJ's conclusion that Dr. Forsythe's words were inconsistent with his actions was based on improper doctor playing. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Although plaintiff has not directly criticized the ALJ's analysis of Dr. Semerdjian's opinions, this Court has concerns about the ALJ's analysis. It would be reasonable to expect that Dr. Semerdjian's testimony would play a central role in the decision. No expert was called at the first hearing, and the case was remanded in part so that an expert could be called to address unresolved issues. Dr. Semerdjian testified at length, offering numerous opinions, many of which supported plaintiff. However, the ALJ's opinion largely glosses over this testimony.

The ALJ referred to Dr. Semerdjian's testimony twice in the opinion. The first time was the following sentence at the end of the above-quoted paragraph: "Dr. Semerdjian's opinion reflects increasing severity of silicosis and COPD, but not until after September 30, 2010." Although this sentence tracks the ALJ's theory that plaintiff's condition essentially plateaued during the relevant period and only deteriorated well after that time, this Court cannot find evidence that Dr. Semerdjian espoused such a view. The second reference was earlier in the opinion where the ALJ stated as follows:

> Regarding the medical expert's ability to make reasonable inferences, Dr. Semerdjian, a Board-certified internist (Exhibit 21F) testified that the claimant's oxygen saturation was actually good at 96% (out of 100%) in January 2012—16 months after termination of insured status, citing Exhibit 28F. Addressing the

11

> December 2009 PFT result, he testified that the result was "quite a bit above" the listing.

R. 829. This passage, unlike the conclusory sentence above, at least refers to two specific facts. However, the ALJ picked out only these two facts, ones that happened to support her theory, but ignored the larger conclusions made by Dr. Semerdjian. Although he opined that plaintiff did not meet a listing, at the same time, he stated that plaintiff's symptoms were nonetheless significant. Two separate statements bear this point out: (1) "So [plaintiff is] not going to meet listing levels *but* he does have significant impairment of functioning."; and (2) "So he has evidence of significant, severe pulmonary—of silicosis with massive pulmonary fibrosis. And he has compromise of his function *though* it doesn't meet a listing level." R. 873, 874 (emphases added). These statements suggest that Dr. Semerdjian, unlike the ALJ, made a distinction between Steps Two and Three and further that he believed plaintiff's impairment qualified as severe at Step Two. To the extent there was any ambiguity in these two statements, then it was incumbent on the ALJ to elicit a clear answer to this obviously important question.

### III.  Credibility.

Plaintiff argues that the ALJ's credibility analysis was flawed. The credibility question was important because, as discussed above, there was objective evidence that plaintiff both had moderate to severe silicosis during the relevant period and that this disease could reasonably be expected to cause the symptoms plaintiff allegedly was experiencing. However, the ALJ found that plaintiff's testimony should be rejected in its entirety because it was not credible.

> The ALJ's credibility analysis consisted of the following paragraph:
>
> The claimant's testimony of the nature and *present* severity of his pulmonary impairments is credible and the undersigned recognizes this. However, he testified that he filed his application for benefits in 2011, when in fact he did not file until February 2012. Exhibit 1D. Nor did he recall a prior filing in August 2004 for both Titles II and XVI benefits. Further, in his testimony at the first hearing in 2013, he

12

> testified that he stopped working because he was let go and was not told why as opposed to alleging his impairments as the basis for stopping working. The undersigned finds a problem with his recall back to 2009-2010. Absent medical evidence of his allegations in addition to his lack of testimonial support of his allegations, the undersigned finds his testimony of severity prior to September 30, 2009 to be unsupported and not credible.

R. 830 (emphasis in original).

This analysis is insufficient, and it is not hard to explain why. To begin with, it focuses on extraneous and relatively minor points. It also ignores the plaintiff's testimony about the specific symptoms at issue (the ALJ did not even summarize this testimony). Putting these problems aside, plaintiff argues in his opening brief that the ALJ's three reasons are all erroneous. This Court need not explain why because the Government agrees with plaintiff's assessment. *See* Dkt. #20 at 13 (acknowledging that the ALJ, not plaintiff, was the one who made the mistakes about these three issues). These errors warrant a remand. *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"). This is not a case where the ALJ relied on one or two improper reasons but also relied on numerous other valid reasons. These three were the only explicit reasons mentioned. Therefore, it would be speculative to conclude, as the Government urges, that the ALJ still would have found plaintiff not credible even if the ALJ had not made these mistakes. *See Allord*, 455 F.3d at 821 ("The [ALJ] based his judgment call on a variety of considerations, but *three of them were mistaken*. Whether he would have made the same determination had he not erred in these respects is speculative.") (emphasis added).

As for the ALJ's broad conclusion that plaintiff had recall problems, two general points should be noted. First, there was contemporaneous evidence that plaintiff reported the same symptoms to doctors during the relevant period that he later testified to in the two hearings. For

example, in the May 2010 emergency room report, doctors noted that plaintiff was *then reporting* an increased cough and shortness of breath. R. 229. To the extent that the ALJ had concern about plaintiff's recollection five years later, there was an easy way to verify those recollections. Second, even if plaintiff misremembered some minor facts at the second hearing, which there is no evidence he did, such a failure of recall would not be surprising given that five years had elapsed. And part of the reason for this delay was the ALJ's failure to fully address these issues in earlier proceeding. On remand, all these issues should be investigated properly and thoroughly.

The ALJ has issued two erroneous decisions in two years. The Court hopes that it does not see a third erroneous decision in this case. Indeed, the Court recommends that a different ALJ be assigned to this case.

**CONCLUSION**

For these reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: May 19, 2017         By: _____
                               Iain D. Johnston
                               United States Magistrate Judge